Good morning, your honors. May it please the court, my name is Scott Grubman. I represent the appellants, Dr. Gupreet Padda and his medical practice, Interventional Center for I'll refer to them collectively as Dr. Padda. Because none of the background facts are really in dispute, may I just jump right into my arguments? You may. Thank you, judge. The issue before this court is whether the district court erred in denying Dr. Padda's motion for a preliminary injunction, which requires this court to decide whether Dr. Padda was deprived of due process when Medicare decided to begin recouping an alleged overpayment of over $5.7 million before an administrative law judge was able to issue a decision in this case. Can I ask kind of a preliminary question? Would this preliminary injunction question be mooted if the ALJ issued a decision? Yes, judge, it would. And as I understood it, the ALJ hearing was scheduled for April 4th, maybe? Yes, judge. So the hearing did occur last week, a week ago today. The ALJ has not issued a decision. Of course, while I can't predict exactly when, I will say that in our experience, we have quite a few of these. We have some that have been pending 9-12 months post-hearing. And so while I was very hopeful yesterday, I was telling my opposing counsel that I'd get an email and be able to email you and say, appeal dismissed. Unfortunately, that hasn't happened yet. And as your honors know from the brief, the law does require an ALJ hearing and decision within 90 days of a timely request. And here, Dr. Pata's request was filed on March 30th, 2021. So clearly well past 90 days. While Medicare and CMS ignores the express mandate to have an ALJ issue a decision within 90 days, at the same exact time, it avails itself of another provision of that same regulatory scheme, which allows it to begin recouping before an ALJ has had the chance to issue a decision. The reason, your honors, I believe that Congress put forth a statutory and regulatory scheme that allowed Medicare to begin recouping after the first two levels of administrative appeal is because the law also required the ALJ to have a very, very quick turnaround. And so had Medicare followed its own regulations, it wouldn't really be a provider one, the money would be returned. Well, let me ask you this. You said that what this requires us to decide is whether Dr. Pata has been deprived of due process under this scheme. But Judge Pitlick made an alternative finding, which is that you made no showing of irreparable harm. And I'm not sure that we even have to get to the due process issue because I don't know that that's, there's not much in this record other than a self-serving affidavit that says without much explanation, without any figures, without anything to say, well, I'd really be hurt. Yes, Judge. So why can't we just affirm on that ground? Well, I hope, I believe that the district court erred in deciding that Dr. Pata did not show irreparable harm. And the key, I believe, is this. The, Dr. Pata submitted two sworn declarations to the district court judge. Very importantly, Medicare, the defendants, didn't submit any declarations on these topics. There was no testimony. There was no evidence to contradict Dr. Pata's sworn testimony. And so therefore, it was uncontro- the facts within Dr. Pata's declarations were uncontroverted, which includes- Is there a conclusion that in his, in his affidavit, you know, and even then- I believe both. And even then, wasn't it hedged a little bit? It's possible that we'd have to shut down our practice? I mean, wouldn't it have been better to have some sort of, you know, here's our financial statement and here's why if they recoup $2 million, I'm out of business, showing some, some numbers? Yes, Judge. And had we gone through discovery, we would have likely been able to develop more. Quite frankly- Why do you do discovery when it's your own material? Well, I misspoke when I said discovery. Quite frankly, we were in such a rush to file this, and I know this isn't an excuse, but we were in such a rush to file this that we got Dr. Pata to address what we believe the court would want to look at based on prior experience. But one of the facts in the affidavit is that the recoupment or offset. So you could, Medicare could either take the money or could offset against future revenue. Either one really has the same effect because you're not getting paid by Medicare. Dr. Pata stated it would cause a significant reduction in his workforce and a reduction in his patient load. I would ask the court, I would propose that just that fact, a reduction in patient load, is enough to show irreparable harm. Because once a patient has to leave a medical practice, then presumably that patient has to go and find another doctor, establish care. It is exceedingly unlikely that that patient would then say, you know what, I'm going to come back once this Medicare overpayment issue is resolved. And the Eighth Circuit has held over and over again that damages that are not quantifiable or compensable leads to irreparable harm. Here the loss of patience and the loss of goodwill that goes along with those loss of patience is not quantifiable and compensable. This morning while I was doing some last minute preparations, I was made aware of a case that unfortunately I did nightside in my brief, but I'm happy to submit a supplemental letter brief if the court would want me to. That case is called Medicine Shop International, Inc. v. SBS Pill, Dr. Inc. 336 F3D801. This court decided that back in 2003. And this court held that the loss of reputation and goodwill can constitute irreparable harm because it is, quote, difficult if not impossible to quantify in terms of dollars. We don't need a supplemental letter brief, but you may submit a letter under Rule 28J with the citation. Yes, thank you. So that's the argument, Your Honors, with regard to irreparable harm. Now moving back to likelihood of success on the merits, there was a couple of aspects that the district court focused on in holding that Dr. Pata did not meet this showing. The first was that there's two levels of administrative appeal before an ALJ hearing. That's a request for redetermination, is Level 1, where you write to the Medicare administrative contractor and ask them to change their mind with regard to the initial determination. And then Level 2, confusingly, is called a request for reconsideration, which goes to another contractor. Now, while my opposing counsel is correct that you do get to submit written statements and written evidence, the point we were trying to focus on in the brief is that the only time you get a live hearing is before an ALJ. And a live hearing is important because it is the first and only time that while you submit evidence, you could also have live testimony to go with that evidence. And I think most crucially, it's the first and only time where an independent arbiter listens to the live testimony and makes all important credibility determinations. I went, I double-checked this yesterday to make sure the statistics were still the same. Medicare's own website, as we cited in our brief, says that at the ALJ level, only 31 percent, 31 percent of cases are upheld in the government's favor. Your Honors, I would argue that any system that gets it wrong such a huge percentage of the time cannot possibly comport with due process. The other issue that the district court judge really focused on, and the government focuses on in their brief, is the fact that Dr. Pate did not avail himself of this escalation provision. It is true that if an ALJ takes longer than 90 days to issue a ruling, then a provider can escalate to the Medicare Appeals Council. It is also true Dr. Pate did not do this. But let me be perfectly clear, Your Honors, that would have required him to forever waive the only opportunity he had for a live hearing. And my argument would be that due process cannot possibly turn on a provider's ability to give up his opportunity for due process in the first place. Of course, that's circular reasoning and can't be the rule. There seems to be some disagreement as to what this live hearing entails. Could you enlighten me on that? Can you, or were you given the opportunity to cross-examine the government's expert witnesses? So what we know, and here's why, because in this case the government decided not to participate in the hearing. If the government agrees to participate, and I know that sounds odd, it's odd to me too, Your Honor, but the government doesn't have to participate. If the government were to participate... How does the government get its evidence in then? The government, they filed a pre-hearing brief. They're allowed to, even if they don't want to participate. But if they decide not to participate, which is a very odd aspect of the regulatory scheme, then we, of course, can't cross-examine them. Well, all the materials from the first two levels are in the record, aren't they? Yes, Your Honor. So if they've submitted written materials earlier... Yes, Your Honor. ...that could be the government's case. Yes, Your Honor, absolutely. What we absolutely had the right to do is to present our own testimony, which we did, and to present documentary evidence. Now, there's a lot of discussion about the Fifth Circuit. Admittedly, there is a case called Sahara Healthcare v. Azhar, where the Fifth Circuit expressively stated that the provider there did not satisfy its burden because it did not avail itself of this escalation provision. However, I believe that case can easily be distinguished on its facts. First of all, the Fifth Circuit expressly held in that case that the provider there could not demonstrate any additional value of the hearing it requests. Later on, last year in 2021, the Fifth Circuit decided a case, MedCert Home Care, which is cited by both parties. There, the court addressed its Sahara decision and held that Sahara was limited to its facts and did not foreclose every due process challenge because each case comes down to its facts. Then, earlier this year in February 2022, as pointed out in the government's supplemental letter brief dated April 4th, the Fifth Circuit decided Adams EMS v. Bacara. While the court in Adams EMS did rule against the provider there, if you read the decision, it expressly states that the main reason it was doing so is because in that case, the provider was only challenging the extrapolation and was not challenging the underlying overpayment determinations. The Fifth Circuit thought that was important because they said, while credibility determinations are very important for a provider testifying as to the claims were appropriate, credibility is not as important when it comes to just simply expert testimony. Let's go back to your argument about the value of having a hearing. You had the hearing recently. What, if anything, did your expert testify about that wasn't contained in his reports that were submitted at the first two levels? The expert, generally, everything was in the reports on the first two levels. However, at least for me, because I am not a statistician, the written submissions were important, I think. Of course, they're required, so we had to do them. Quite frankly, I read them and my eyes glaze over. I don't know what they mean. I believe it was extremely important for both. We had two statistical experts last week at the hearing. For them to give live testimony and explain in real time how all of this works. Additionally, very importantly, not only do we have those two experts, Dr. Pata himself testified. And that's where I believe that is the only opportunity ever. You have the first two levels, no hearing. You have the Medicare Appeals Council, no hearing. District Court review after that, no hearing. So the one and only time to allow him to provide live testimony, where someone could challenge his credibility, or at least, you know, the Court of Appeals holds all the time. District Court judges, and here, of course, it's an ALJ, are in a unique position to hear live testimony and make credibility determinations. Other than the ALJL hearing, there was no opportunity. I did reserve a couple of minutes. Yes, Your Honor. What did Dr. Pata testify about that was subject to a credibility finding? The appropriateness of the underlying claims. So essentially, you know, Medicare providers submit claims to Medicare. But I'm trying to focus on what's a credibility question as opposed to, you know, whether he just disagrees with their evaluation of the claims or something like that. That's not a credibility question. Well, he testified more detail. He testified as to why his treatment of the patients were medically necessary, why his patients were complex patients and required a higher level of billing code. And so there are a lot of issues that you do have to believe Dr. Pata, the ALJ really did have to believe Dr. Pata, to believe that there was no overpayment in the first place. Your Honor, unless there is any other question, I will reserve the remainder of my time. Thank you so much. All right. Thank you for your argument. All right, Ms. Edwards, we'll hear from you. Thank you. My name is Kyle Edwards. I represent HHS. May it please the court, the district court properly denied Pata's motion for a preliminary injunction because among other reasons, Pata cannot establish a likelihood of success on the merits of his due process claim. The two other circuits to have considered this issue, the Fourth and the Fifth Circuits, have both determined that providers bringing the same procedural due process claim under materially indistinguishable circumstances could not establish a due process violation. Indeed, Pata has not pointed in his briefs or today to any decision of the Supreme Court or any court of appeals that has held that two levels of pre-deprivation review followed by review in federal district court fail to satisfy the constitutional minimum of due process. Let me ask you this. Does HHS have the authority, just in sort of a sense of fairness, to say, well, if we can't get to the claim in the 90 days and it's going to take us two years to do what we said we'd do in 90 days, that we're not going to start to withhold? Can they just voluntarily do that? No, the Medicare contractor who's responsible for recouping the payments is under an obligation to recoup those payments after the second level of review. I should note again that, as we point out in our briefs, the 90 days is provided by statute, but Congress provided the escalation mechanism, sort of predicting that there might be difficulty meeting that 90-day period. If there's further questions on the merits of the procedural due process claim, I'm happy to address those. Otherwise, I'll turn briefly to the irreparable harm. The district court also correctly concluded that Pata failed to establish... Dr. Pata's credibility in this case and witnesses' credibilities in general can only be assessed at a live hearing. And that means there's a risk of erroneous deprivation if we don't have the third level. So Pata has not explained why credibility is an issue in this case. Today... I mean, he just did. Today, he said that it's important for there to be statistical experts to sort of explain the sort of statistical basis for the report that the statistician put in. I don't believe my friend on the other side sort of explained why credibility is at issue. Well, I heard him say that it was not the statisticians, it was the doctor himself who testified. Didn't you hear that? I did, Your Honor. Okay, well, you were just talking about statisticians. So starting with the statistician. Turning to Dr. Pata's testimony, again, there was not information in there about why credibility would be necessary. Under the statute of regulations, providers are required to submit documentation that establishes their entitlement to payment. Dr. Pata could not have established that through live testimony. It was required to be documented in contemporaneous documentation that was supposed to be submitted at the first two levels of this review process. Indeed, the regulations and the statute say that there must be full and early presentation of evidence, and you can't present new evidence at the hearing absent good cause. Well, if the issue is whether a particular treatment's medically necessary and the doctor says, in my professional opinion, this treatment is medically necessary and the government says, no, it isn't, isn't that a credibility issue? Well, if you look in the JA here, the issue in many cases had nothing to do with credibility. It had to do with whether certain documents were actually submitted and whether the documents were properly signed and dated by the physician. And so those sorts of questions are readily determinable on the papers. So, for instance, in the Matthews v. Eldridge case, the Supreme Court explained that issues of medical expert judgment, and I think that would extend to statistical expert judgment, both of those is information that is readily presented in written form and is, in fact, more amenable to written presentation than it is to oral presentation. And that's why in a case like Matthews v. Eldridge, a live hearing was not required before disability benefits were paused. Well, and when we talk about credibility as statisticians, I mean, credibility to me goes to the issue of whether or not they're telling the truth. But when you're cross-examining an expert, you're also looking also at not only their truthfulness, but their methodology and their techniques and whether their statistical analysis makes sense from a statistical standpoint. I'm sort of not saying that very artfully, but we also look at things like methodology. Isn't that also part of the whole purpose of cross-examination? No, Your Honor. So statistical methodology is definitely something that's more amenable to written presentation than to oral presentation. And indeed, at the second level of this review process, the statistical extrapolation methodology that was used by the auditor in this case was reviewed and was replicable by an expert statistician who reviewed that. So both the underlying medical claims were reviewed by a panel of medical experts, and then the statistical claims at the second level of review were reviewed by a statistical expert. Well, I guess I'm troubled by the argument, though, that if your statistical experts are rejected 70% of the time, doesn't that tell you something about their methodology? So I'm not sure where the 70% is coming from, Your Honor. The, I believe the statistics that my friend on the other side was citing are statistics about what happens to appeals from the second level of review to the ALJ level of review. And I want to, let me explain to you the statistics. So there are fully favorable decisions for a provider from the second level of review to the ALJ stage 20% of the time. There's partially favorable in favor of the provider 2.1% of the time. Decisions are unfavorable 31% of the time. And cases are dismissed 46.9% of the time. There's not a disaggregation on the Office of Medicare Hearings and Appeals website of what happens to the, why those cases are dismissed. Some of them are settled. Some of them are probably voluntarily dismissed. So I don't have a breakdown on that. But saying that it's not the case that 70% of the time those determinations by the second level reviewer are overturned. And that actually refers to the rate of- Was it 30 some percent of the time they're overturned? Is that what you're saying? 31% of the time they are unfavorable. Unfavorable to the government? No, unfavorable to the provider. So they're fully favorable for the provider 20% of the time. So the provider prevails before the ALJ 20% of the time. 20%, all right. And I want to point out after having given you those statistics that Matthews v. Eldredge explicitly states that bare statistics rarely provide a satisfactory measure of the fairness of a process. In part because they can be manipulated based on what you're counting as the numerator and what you're counting as the denominator as the sort of 70% figure you might have drawn away would suggest. So we don't think the statistics actually show much about the fairness of this process or whether due process has been provided. Again, the court in Sahara in the Fifth Circuit held that the first two stages of this review process, they're both essentially paper hearings where the provider is allowed to submit any evidence their provider wants. And indeed, all of the documents to substantiate the provider's claims for payment are in the provider's possession if they exist. And the Fifth Circuit and the Fourth Circuit both held that those two levels of review provide meaningful opportunities to be heard. And there also exists this escalation process. So the provider could go on to the Medicare Appeals Council at the fourth level of review, and then on to federal district court. And when you're thinking about the sort of process that's being provided, federal district court is a very important point on that scale. Shall I turn briefly to the irreparable harm? You may. So again, the district court properly determined that Dr. Pata has not established any irreparable harm absent an injunction, because his declarations establish at most that he will suffer temporary and recoverable economic losses through the standard process of recoupment by offsetting future Medicare payments. That offsetting recoupment process has been in effect since May 2021. And in Dr. Pata's declarations, he stated that he would be out of business within a month of going through recoupment. And we're here about a year later, and there's no evidence that he's gone out of business or substantially had to reduce his business. So again, we believe that the district court properly concluded both that there's no likelihood of success on the merits here, and that there's no likelihood of irreparable harm absent an injunction. I'm happy to answer any other questions. One quick one. Did the ALJ give any indication, or does the government have any idea when the ALJ might rule? No, Your Honor. So there's sort of firewalls within the agency between the Office of Medicare Hearings and Appeals and the ALJs and the rest of CMS. So we wouldn't directly communicate with the ALJ. I can say that in cases where there is both a challenge to the medical determination that payment is required and to the statistical extrapolation methodology, that those statistical extrapolation challenges actually take longer on average than ones where there's just the overpayment determination issue. Thank you. What is the average time? Do you know? I don't have data on that, no, Your Honor. What's the status of the mandamus order? So get the hearings done within 30 days. Within, so the- 90 days, excuse me. Yes, Your Honor. So there was a status report filed on March 29th in that case. And the backlog that was at issue has been reduced by 88% according to the status report. And so that's down from 426,000 about appeals at the start of the mandamus order to now 52,641 appeals. And the status report states that the HHS is making significant progress toward meeting its final reduction target set out in the mandamus order. Which is what? To eliminate the backlog. By when?  What do you say to the argument, putting aside a financial harm on the recoupment alone, but that reputational harm and loss of patients in and of itself is irreparable harm? I guess two points, Your Honor. The first is that that hasn't actually been argued in the briefs, this idea of goodwill. In terms of a reduction in patients, that's just a direct result of the sort of temporary and recoverable economic losses that Dr. Pata might experience. Again, there was no sort of concrete evidence presented in the declarations about what sort of patient loss Dr. Pata might experience under the recruitment process. The declarations don't contain a lot of detail. And so I would say on the facts as they're stated in the declaration, there's not a lot to go on in terms of loss of patients and goodwill. And then also just that that hasn't been argued in the briefs before this court on appeal. If there's no further questions, we ask that the court affirm the district court's judgment. Thank you. Very well. Thank you for your argument. You're just about out of time, Mr. Grubman. Yes, sir. I just have one. All right. We'll hear you out on that then. I just wanted to address the loss of patients. The reason the affidavits don't address details of what's going to happen is because they're submitted before it happens by necessity. We can't just keep updating it. I will tell you since it was brought up, Dr. Pata has dismissed 60% of his patients in the last year due to this alone. So we ask that this court reverse the district court and remand for instructions to rule on the other two factors of the preliminary injunction test, which the district court did not get to. Thank you so much. Great. Yes, sir. What you want is a remand to the district court with directions to conclude that there's likelihood of success and irreparable harm. I would absolutely love if this court could decide the other two factors and simply remand- Which are what? Public interest? Which are public interest and a balancing of the equities. In all candor, my belief is that the district court probably does have to make those determinations on remand. So while I hope to be wrong on that, that would be what I believe the best we could ask for is. Unless there are any other questions. As a practical matter, this ALJ is going to be- I hope so, Judge. But like I said, we have another case right now. It's exceeding nine months. I asked my associate yesterday. Exceeding nine months post-ALJ hearing. So I really, really hope that when I'm done here, I get a message saying it was done. I'm just not very optimistic. All right. Thank you so much. It was nice meeting you. Thank you to both counsel.